| Gallagher v Lugo |
| :---: |
| 2024 NY Slip Op 34262(U) |
| November 26, 2024 |
| Supreme Court, Kings County |
| Docket Number: Index No. 508807/2017 |
| Judge: Consuelo Mallafre Melendez |
| Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service. |
| This opinion is uncorrected and not selected for official publication. |

**At an IAS Term, Part 15 of the Supreme Court of the State of NY, held in and for the County of Kings, at the Courthouse, at 360 Adams Street, Brooklyn, New York, on the 26th day of November 2024.**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
-------------------------------------------------------------------------X
JAMES GALLAGHER,

      Plaintiff,

  -against-

JOANELLE LUGO, M.D., MEHUL R. SHAH, M.D.,
EDDIE LOUIE, M.D., PATRICK LAMPARELLO,
M.D. and NYU LANGONE MEDICAL CENTER,

      Defendants.
-------------------------------------------------------------------------X

**DECISION & ORDER**

Index No. 508807/2017
Mo. Seq. 3

**HON. CONSUELO MALLAFRE MELENDEZ, J.S.C**.
Recitation, as required by CPLR §2219 [a], of the papers considered in the review:

NYSCEF #s: 46 – 48, 49 – 73, 75 – 77, 78

Defendants Joanelle Lugo, M.D. ("Dr. Lugo"), Mehul R. Shah, M.D. ("Dr. Shah), Eddie Louie, M.D. ("Dr. Louie"), Patrick Lamparello, M.D. ("Dr. Lamparello"), and NYU Hospitals Center s/h/a NYU Langone Medical Center ("NYU Langone") move (Seq. No. 3) for an Order, pursuant to CPLR 3212, granting summary judgment to the defendants and dismissing Plaintiff's complaint in its entirety.

Plaintiff opposes the motion as to defendants Dr. Lugo, Dr. Louie, Dr. Lamparello, and NYU Langone. Plaintiff's complaint against Dr. Shah was previously discontinued by stipulation of all parties, and the branch of the motion seeking summary judgment on his behalf is moot.

Plaintiff commenced this action on May 1, 2017, asserting claims of medical malpractice against all the defendants in connection to the treatment of a diabetic foot and bone infection from approximately December 18, 2015 through February 27, 2016.

At the time of the events at issue, Plaintiff was 56 years old and had a medical history including type II diabetes, peripheral neuropathy, and hypertension. On November 13, 2015, he injured his left foot by dropping a heavy object on it. He testified that on December 4, he first noticed a hole on the bottom of his foot. He

1

[* 1]

presented to non-party podiatrist Glenn Weiss, DPM at Union Health Center on December 18 with signs of infection, including swelling, foul smell, and fluid leaking from the wound. Dr. Weiss advised him to go to a hospital emergency department for suspected osteomyelitis, Charcot fracture, or dislocation of the foot.

Plaintiff first presented at the NYU Langone emergency department on December 18, 2015, and he was admitted to the general medicine floor with a left diabetic foot ulcer. He was examined by vascular surgery consult Dr. Lugo, who performed a surgical debridement of the wound on the morning of December 19. Plaintiff was also evaluated and treated during his admission by infectious disease consult Dr. Louie. Dr. Louie began him on a six-week course of antibiotics by IV/PICC line. Plaintiff was discharged on December 22 with instructions to follow up within two weeks with Dr. Lugo, Dr. Louie, and the Diabetic Foot and Ankle Center.

On December 29, Plaintiff followed up with vascular surgeon Dr. Lamparello through NYU Langone Health System. On examination, he documented Plaintiff had a "4-5 cm necrotic left foot lesion and area of ulceration where debridement was performed" and continued the plan of care of IV antibiotics and dressing changes.

On January 19, Dr. Lamparello saw Plaintiff for a follow-up and noted the wound had improved. Dr. Louie saw the patient on January 21 and noted the wound was "markedly better" and that osteomyelitis was not definite but not excluded as a diagnosis. Plaintiff's antibiotic course was completed on January 27, and the PICC line was removed on January 29.

On February 2, Plaintiff was seen by Dr. Lamparello again. On examination, he documented excessive granulation tissue and callus formation. He advised that off-loading the left foot was necessary, and he would possibly need further surgical debridement or skin graft. Plaintiff was also seen by non-party Dr. Weiss on February 5 and received home visits from Visiting Nurse Service for wound care and dressing changes.

On February 18, Plaintiff returned to the NYU Langone emergency department with worsening foot pain, redness, swelling, and non-healing 7 cm ulcer. An x-ray showed evidence of bone changes and Dr. Lamparello recommended an MRI. On February 19 MRI revealed bone infection in the midfoot bones and metatarsal areas, septic arthritis, and residual bone irregularities. Plaintiff underwent additional surgical

2

debridement and a surgical resection of the tarsal bone of the left foot by Dr. Lamparello. Plaintiff was also evaluated by Dr. Louie and prescribed further antibiotics with an inserted PICC line. He was discharged on February 27 for home wound care and rehab.

Plaintiff continued to follow up with non-party Frank L. Ross, M.D. at NYU Langone for wound care. On November 5, 2016, he sought treatment at non-party New York Presbyterian Methodist Hospital for his continued swelling and chronic foot pain at the site of the healed ulcer. His radiological studies showed osteopenia (reduced bone density) and deformity of the tarsometatarsal joint.

Plaintiff alleges that the defendants departed from the standard of care by failing to appropriately diagnose and treat his osteomyelitis during his initial admission in December 2015, or his follow-up treatment with Dr. Lamparello on December 29, 2015 and January 19, 2015. Plaintiff alleges that these departures proximately caused the worsening of his condition and persistent limitations and injuries.

As an initial matter, the movants argue that Plaintiff's complaint should be dismissed against NYU Hospitals Center s/h/a NYU Langone Medical Center as an institutional defendant, because they bear no vicarious liability for the named defendants. The movants submit an affidavit from Jeffrey W. Stupak ("Mr. Stupak"), an employee with knowledge of the corporate structure and records of NYU Hospitals Center and affiliates. Mr. Stupak avers that Dr. Lugo, Dr. Louie, and Dr. Lamparello were never employees of the entity sued herein, but instead employed by "NYU Grossman School of Medicine, a Division of New York University." He also avers that the hospital defendant "operates six inpatient facilities including Tisch Hospital, the main campus located in Manhattan," which is the hospital where Plaintiff presented to the emergency department on December 18, 2015.

It is well established that a hospital is vicariously liable for its employees but not independent contractors and private physicians with admitting privileges to the facility. "However, an exception to this general rule exists where a plaintiff seeks to hold a hospital vicariously liable for the alleged malpractice of an attending physician who is not its employee where a patient comes to the emergency room seeking treatment from the hospital and not from a particular physician of the patient's choosing" (*Fuessel v Chin,* 179 AD3d 899, 901 [2d Dept 2020], quoting *Muslim v Horizon Med. Group, P.C.,* 118 AD3d 681 [2d Dept 2014]). This long-held exception was set

3

[* 3]

forth in *Mduba v Benedictine Hosp.* (52 AD2d 450 [3d Dept 1976]), where the court held that a hospital is vicariously liable for the acts and omissions of a physician provided to the patient, "having held itself out to the public as an institution furnishing doctors, staff and facilities for emergency treatment" (*id.,* at 454). Thus, a hospital seeking summary judgment must demonstrate that the physician alleged to have committed malpractice was an independent contractor *and* that this exception to the general rule does not apply.

The affidavit submitted by the movants sets forth that Dr. Lugo, Dr. Louie, and Dr. Lamparello were not "employed" by NYU Hospitals Center, but they fail to establish the hospital's freedom from vicarious liability under the *Mduba* doctrine of emergency treatment. As Plaintiff notes in opposition, the patient presented to the emergency department of one of NYU Langone's inpatient hospital facilities on December 18, 2015. Dr. Lugo was then furnished to Plaintiff as his attending physician and surgeon and Dr. Louie as an infectious disease consult. As to Dr. Lamparello, the record is unclear as to his relationship with NYU Hospitals Center or the NYU Langone Health System. While the movant's affidavit states that he was not an employee, Dr. Lamparello testified that he was a vascular surgeon whose "primary responsibility is at NYU Langone," and that he became involved in Plaintiff's care because he was on call rather than Dr. Lugo at the time Plaintiff presented for his follow-up. For these reasons, the movants have failed to establish as a matter of law that NYU Langone is not vicariously liable for the acts and omissions of Dr. Lugo, Dr. Louie, or Dr. Lamparello, who were provided to Plaintiff after he presented to the emergency department, not physicians of his choosing.

In evaluating a summary judgment motion in a medical malpractice case, the Court applies the burden shifting process as summarized by the Second Department:

"The elements of a medical malpractice cause of action are a deviation or departure from accepted community standards of practice, and that such departure was a proximate cause of the plaintiff's injuries. When moving for summary judgment, a defendant provider has the burden of establishing the absence of any departure from good and accepted medical practice or that the plaintiff was not injured thereby. In order to sustain this burden, the defendant must address and rebut any specific allegations of malpractice set forth in the plaintiff's bill of particulars. In opposition, the plaintiff must demonstrate the existence of a triable issue of fact as to the elements on which the defendant has met his or her initial burden. General allegations of medical malpractice, merely conclusory and unsupported by competent evidence tending to

4

[* 4]

establish the essential elements of medical malpractice, are insufficient to defeat a defendant's summary judgment motion. Although summary judgment is not appropriate in a medical malpractice action where the parties adduce conflicting medical expert opinions, expert opinions that are conclusory, speculative, or unsupported by the record are insufficient to raise triable issues of fact" (*Barnaman v Bishop Hucles Episcopal Nursing Home,* 213 AD3d 896, 898-899 [2d Dept 2023] [internal quotation marks and citations omitted].

In support of the motion, the defendants submit an expert affirmation from William Doscher, M.D. ("Dr. Doscher"), a licensed physician certified in vascular surgery; an expert affirmation from David Hirschwerk, M.D. ("Dr. Hirschwerk"), a licensed physician certified in internal medicine and infectious diseases; and an expert affirmation from Malka Finkelstein, M.D. ("Dr. Finkelstein"), a licensed physician certified in diagnostic radiology. These experts have each set forth a proper foundation to opine on the particular issues related to their fields of vascular surgery, infectious disease, and radiology, in the context of a patient with osteomyelitis. The movants also submit relevant medical records and deposition transcripts.

Beginning with Dr. Lugo, the vascular surgery specialist who first treated Plaintiff on December 18, the movant's expert Dr. Doscher opines that she acted in accordance with good and accepted practice at all times in her treatment of Plaintiff. Dr. Doscher opines that Dr. Lugo properly assessed the status of Plaintiff's necrotic wound at approximately 8:00 p.m. on December 18, 2015. In the expert's opinion, the standard of care is "to be as careful and conservative as possible to remove the infected area as quickly as possible." Based on the x-ray and CT scan, the expert opines that Dr. Lugo properly performed a soft tissue debridement. The expert opines that no further radiological studies were required before this debridement, that it was in accordance with the standard of care for Dr. Lugo to remove only the infected or necrotic tissue that was visible, and that this debridement was "performed in the most conservative of ways to prevent any additional damage to [Plaintiff's] feet or skin." The expert further opines that Dr. Lugo appropriately noted that he had suspected osteomyelitis, and he received proper infectious disease consultation and an MRI on December 20.

Dr. Doscher opines that, contrary to Plaintiff's claim that Dr. Lugo failed to remove all the infected bone, the only way to do so would have been a total below-the-knee amputation of his left foot. The expert opines that

5

Dr. Lugo did not depart from the standard of care by performing a more conservative surgical debridement. The expert further opines that Dr. Lugo properly relied on the infectious disease specialist Dr. Louie to treat the remaining infection with a long-term antibiotics course.

Finally, Dr. Doscher opines that Plaintiff was not improperly discharged on December 22. At that time, in the expert's opinion, he was "stable and being managed properly" with PICC line antibiotics, crutches, and an offloading brace.

The movant's radiological expert Dr. Finkelstein also opines that, based on their own interpretation of the radiological films in the patient's chart, Dr. Lugo properly performed the December 19 debridement and successfully removed any abscess and infected tissue, leaving "only healthy tissue." According to Dr. Finkelstein, the December 20 MRI following the debridement showed there was "no discrete or walled-off fluid collection or abscess." In the expert's opinion, the film "demonstrates post-surgical changes and residual infection of bones consistent with interval surgery," but there is no radiological evidence that Dr. Lugo deviated from the standard of care by failing to remove any infected tissue or abscess.

Turning to Dr. Lamparello, Dr. Doscher opine that his evaluation and treatment of Plaintiff was "peripheral and within the standard of care." The expert opines that on his December 29 appointment, just one week after Dr. Lugo performed the debridement, Dr. Lamparello properly examined the foot and directed the patient "to continue the IV antibiotics, continue with dressing changes, and to stay off the left foot." Dr. Doscher notes that his bloodwork was normal at that time and white blood cells were not elevated. He opines that it was appropriate within the standard of care for a vascular surgeon to defer to the treatment of the infectious disease specialist, who had prescribed proper medications for suspected osteomyelitis. In the expert's opinion, based on the patient's presentation and ongoing treatment, it was not necessary or required by the standard of care "to pursue any additional treatment at that time" except to monitor the healing of his ulcer.

The expert also notes that on Dr. Lamparello's next appointment on January 19, 2016, the wound "had improved dramatically," and therefore opines that the patient did not require any additional debridement or testing at that time. The expert opines that the granulation or "healing tissue" observed on February 2, 2016 demonstrated

6

[* 6]

that the wound "was continuing to improve" and there was "sufficient blood flow to his foot to allow for appropriate healing." The expert also opines in detail as to Dr. Lamparello's removal of the necrotic tarsal bone when he was readmitted to NYU Langone on February 18, 2016. The expert opines that this surgery gave Plaintiff "the best opportunity in the most conservative approach for his foot to heal without needing to amputate the left foot and leg entirely."

On the issue of proximate causation, the surgery expert Dr. Doscher opines that no alleged departures from the standard of care by Dr. Lugo or Dr. Lamparello were a proximate cause of Plaintiff's claimed injuries. He opines that the patient's recurring infection and skin breakdowns resulted from his chronic conditions including Charcot foot, "a condition causing softening of the bones in the foot that can occur in people who have significant nerve damage (neuropathy) from diabetes." The expert opines that with diabetic neuropathy, an infection "does not always heal even with perfect administration of antibiotics and proper treatment." The expert notes that he came into the emergency department with an already severe skin breakdown and Charcot foot, which had worsened without medical attention for weeks. He also notes that there is evidence from his treatment with Visiting Nurse Service that the patient was often non-compliant with offloading his foot, which caused additional breakdown and re-infection. The expert opines "most of the left foot bones were no longer infected" by the time of his February 2016 MRI, but the patient's comorbidities and his own improper offloading of the foot caused a recurrent infection.

Finally, as to defendant Dr. Louie, the movant's infectious disease expert Dr. Hirschwerk opines that he properly treated Plaintiff within he standard of care for an infectious disease specialist. The movants note that Plaintiff's supplemental bill of particulars withdrew all claims of inappropriate administration of antibiotics against Dr. Louie. Nonetheless, the infectious disease expert opines in detail that Plaintiff was properly placed on broad-spectrum antibiotics upon his admission to NYU Langone, and that Dr. Louie properly recommended a six-week course of Zosyn when he examined Plaintiff on December 19. Dr. Hirschwerk notes that osteomyelitis was not the definitive diagnosis at that time, but it had not been ruled out by Plaintiff's CT scan, and therefore "in an excess of caution" Dr. Louie prescribed the most appropriate antibiotics to treat osteomyelitis. In the

7

[* 7]

expert's opinion, discharging Plaintiff with a six-week course of Zosyn was well within the standard of care to treat osteomyelitis. Additionally, the expert opines that with no fever and normal vital signs, the patient was clinically stable for discharge and recovery at home.

Dr. Hirschwerk also opines that as a patient with risk factors including type II diabetes, smoking, diabetic neuropathy, and neurogenic arthropathy, Plaintiff was predisposed to develop a "recurring infection" despite proper treatment. The expert opines that the acts of Dr. Louie did not proximately cause the recurrence of his infection to the area, and Plaintiff's subsequent injuries were unavoidable despite his best efforts to heal the infection.

Based on the expert submissions, the movants established prima facie that there were no underlying departures from the standard of care on the part of Dr. Lugo, Dr. Louie, or Dr. Lamparello. The experts opine that the defendants herein properly treated and healed his existing diabetic foot wound in December 2015, prescribed an appropriate course of antibiotics on suspicion of osteomyelitis, and monitored his condition. The movants also establish prima facie that no acts and omissions on the defendants' part proximately caused any fracture, injury, or deformities to his bone and joints. The burden therefore shifts to Plaintiff to raise a triable issue of fact.

In opposition to the motion, Plaintiff submits an expert affirmation from Michael Bergman, M.D. ("Dr. Bergman"), a licensed physician who is board-certified in internal medicine and infectious disease. The expert lays a proper foundation to opine on the issues herein, as a certified infectious disease specialist who avers he has managed patients with acute and chronic osteomyelitis and Charcot foot, and he is familiar with the standard of care with respect to surgical debridement and treatment of such infections.

Plaintiff's expert, Dr. Bergman, opines that the defendants herein failed to properly diagnose, treat, and remove the source of Plaintiff's infection during his December 2015 hospital admission and follow-up treatment, allowing the bone infection to progress and worsen. The expert notes that Charcot foot "is a risk factor for deep [diabetic foot infections] that can readily extend to bone and joints and be misdiagnosed as uninfected unless clinical parameters are closely followed." The expert opines that in chronic bone infections from Charcot foot, antibiotic treatment alone is insufficient and "doomed to fail" unless there is also aggressive, contemporaneous

8

debridement of the bone and drainage of abscesses.

Dr. Bergman opines that Dr. Lugo departed from the standard of care by relying on a CT imaging study rather than a superior MRI before performing a surgical debridement on December 19. Dr. Bergman opines that Dr. Lugo failed to debride or culture the infected bone and treated only the infected tissue. Contrary to Dr. Lugo's own testimony that she stopped the debridement after removing all the infected tissue, Dr. Bergman opines that "[o]ne cannot assess the success of removing all the infected tissue on visual observation," and she failed to appreciate there were still microscopic components she had failed to remove. The expert further opines that the MRI taken on December 20 showed a large abscess collection, and Dr. Lugo failed to return the patient to the operating room "for aggressive drainage and debridement procedures." In Dr. Bergman's opinion, Plaintiff's infection was not sufficiently treated, the source was not removed, and therefore his discharge on December 22 was improper.

Dr. Bergman also opines that the infectious disease specialist Dr. Louie "knew or should have known that discharge of this patient was premature based on his MRI result," and that the patient "needed debridement, cultures and drainage which had not been done." On this basis, Dr. Bergman counters Dr. Hirschwerk's expert opinion that it was within he standard of care to discharge the patient on December 22, opining that his osteomyelitis "never fully cleared," that there was still infected bone and abscess, and the course of antibiotic treatment prescribed was inadequate.

Similarly, Dr. Bergman opines that Dr. Lamparello should have arranged for further surgical debridement on December 29 and/or January 19, because he was able to review the December 20 MRI showing that abscess and infection remained in the left foot. Dr. Bergman opines that Dr. Lamparello did not properly address "the diagnosis of presumed osteomyelitis" or take into account his enlarged ulcer or weight loss.

Finally, Dr. Bergman opines that as a result of these departures, Plaintiff's diabetic foot infection "eventually became more extensive, involving the dorsum of his foot," and he was readmitted to NYU Langone on February 18, 2016 with "extraordinary inflammatory markers" in his blood work, as well as destructive bone changes. Dr. Bergman notes that the movant's expert acknowledged "*most* of the left foot bones were no longer

9

infected" and opines that his initial infection had not fully healed. Dr. Bergman counters the opinion of the movants' experts that Plaintiff's claimed injuries were the inevitable result of his preexisting chronic conditions. Instead, he opines that the osteomyelitis worsened and caused "extensive deformity . . . and chronic pain in the left foot" as a result of the defendants' departures from the standard of care in treating the source of infection.

Based on these submissions, Plaintiff's infectious disease expert raises issues of fact sufficient to preclude summary judgment on behalf of all the defendants. The expert sets forth a conflicting opinion that antibiotics were insufficient to treat the underlying bone infection and that a more aggressive surgical debridement was required to remove infected bone and drain the collected abscess. The expert also sets forth a conflicting opinion on whether Plaintiff's chronic infection, deformities, and other claimed injuries were proximately caused by these alleged deviations from the standard of care. "When experts offer conflicting opinions, a credibility question is presented requiring a jury's resolution" (*Stewart v. North Shore University Hospital at Syosset*, 204 AD3d 858, 860 [2d Dept. 2022] citing *Russell v. Garafalo,* 189 AD3d 1100, 1102 [2d Dept. 2020]). Accordingly, summary judgment is precluded as a matter of law.

Accordingly, it is hereby:

**ORDERED** that the branch of Defendants' motion (Seq. No. 3) seeking summary judgment in favor of Dr. Shah and dismissing Plaintiff's complaint against him is **GRANTED** without opposition; and it is further

**ORDERED** that the branches of Defendants' motion (Seq. No. 3) seeking summary judgment in favor of Dr. Lugo, Dr. Louie, Dr. Lamparello, and NYU Hospitals Center s/h/a NYU Langone Medical Center is **DENIED**.

The Clerk shall enter judgment in favor of MEHUL R. SHAH, M.D.

This constitutes the decision and order of this Court.

ENTER.

_____

**Hon. Consuelo Mallafre Melendez**

**J.S.C.**

10

[* 10]